07-4449-cv (L)
Southerland v. City of New York

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: April 21, 2009                    Decided: June 10, 2011
                    As Amended: May 14, 2012)

Docket Nos. 07-4449-cv (L), 07-4450-cv (CON)

-------------------------------------

SONNY B. SOUTHERLAND, SR., individually and as parent and natural guardian of VENUS SOUTHERLAND, SONNY B. SOUTHERLAND, JR., NATHANIEL SOUTHERLAND, EMMANUEL FELIX, KIAM FELIX, and ELIZABETH FELIX,

Plaintiffs-Appellants,


- v -

CITY OF NEW YORK, TIMOTHY WOO, JOHN DOES 1-9,

Defendants-Appellees.*

-------------------------------------

Before:   KEARSE, SACK, and HALL, Circuit Judges.

Consolidated appeals from a summary judgment entered by the United States District Court for the Eastern District of New York (Charles P. Sifton, Judge) in favor of, inter alios, the defendant Timothy Woo. The plaintiffs -- a father and his children -- bring various claims under 42 U.S.C. § 1983 asserting that Woo, a children's services caseworker employed by the defendant City of New York, entered their home unlawfully and effected an unconstitutional removal of the children into state

---

* The Clerk of Court is directed to amend the official caption in accordance with the foregoing.

custody. The district court concluded that Woo was entitled to qualified immunity with respect to all of the claims against him. The grant of summary judgment is affirmed with respect to the father's substantive due process claim, but vacated and remanded with respect to the father's and children's Fourth Amendment unlawful-search and Fourteenth Amendment procedural due process claims, and the children's Fourth Amendment unlawful-seizure claim.

As amended, affirmed in part; vacated and remanded in part.

MICHAEL G. O'NEILL, New York, N.Y., for Plaintiffs-Appellants Venus S., Sonny B.S. Jr., Nathaniel S., Emmanuel F., Kiam F., and Elizabeth F.

SONNY B. SOUTHERLAND, Brooklyn, N.Y., Plaintiff-Appellant, pro se.

JULIAN L. KALKSTEIN, City of New York (Michael A. Cardozo, Corporation Counsel; Larry A. Sonnenshein, of counsel), New York, N.Y., for Defendants-Appellees.

SACK, Circuit Judge:

This lawsuit involves a man and a woman -- the plaintiff Sonny B. Southerland Sr. ("Southerland") and non-party Diane Manning -- two groups of children, and a caseworker's apparent confusion between the two groups. Plaintiff Ciara Manning is the daughter of Southerland and Diane Manning. Ciara

was supposed to be living with Southerland at the time in question, but in fact had left to live with a friend, and had not resided in Southerland's home for at least a year.

In addition to Ciara, plaintiff Southerland fathered, by one or more women other than Diane Manning, six other children: the plaintiffs Venus Southerland, Sonny B. Southerland Jr., Nathaniel Southerland, Emmanuel Felix, Kiam Felix, and Elizabeth Felix (together, the "Southerland Children"). At the time of the principal events in question, the Southerland Children, unlike Ciara, were living with their father.

Diane Manning also allegedly bore, by one or more men other than Southerland, six children other than Ciara: Eric Anderson, Richy Anderson, Felicia Anderson, Erica Anderson, Michael Manning, and Miracle Manning (together, the "Manning Children"). They lived with Diane and, like her, are not parties to this lawsuit.

In May 1997, the defendant Timothy Woo, a caseworker in the Brooklyn Field Office of the New York City Administration for Children's Services ("ACS"), was assigned to investigate a report by a school counselor about then-sixteen-year-old Ciara Manning. School staff had thought Ciara to be acting strangely.

After being unable, despite repeated attempts, to gain entry to the Southerland home to investigate the report, Woo sought and obtained from the Kings County Family Court an order

3

authorizing entry into the apartment. Woo's application to obtain that order contained several misstatements of fact, which suggested Woo's possible confusion about which of the children resided with Southerland.

Under the authority of the Family Court's order, Woo then entered the Southerland apartment. Ciara was not there; some of Southerland's other children who lived with him, the Southerland Children, were. Based on what Woo perceived to be the poor condition of the home and of the Southerland Children, and based upon his other observations from the investigation undertaken to that date, Woo and his supervisor decided to carry out an immediate removal of the children into ACS custody.

Southerland and the Southerland Children brought this action based on Woo's entry into the apartment and removal of the children. They claim that Woo violated their Fourth Amendment[1] rights to be free from unreasonable searches of their home, and that the manner in which the Southerland Children were removed violated their procedural due process rights under the Fourteenth Amendment. Southerland also claims that the removal of the Southerland Children from his home violated his substantive due

---

[1] We refer throughout this opinion to asserted Fourth Amendment rights of the plaintiffs. Inasmuch as the defendants are state and not federal actors, of course, whatever rights the plaintiffs have are "under the Fourth Amendment, as applied to the States under the Fourteenth Amendment['s]" Due Process Clause. Kia P. v. McIntyre, 235 F.3d 749, 761 (2d Cir. 2000); see Mapp v. Ohio, 367 U.S. 643, 655 (1961).

4

process rights under the Fourteenth Amendment.  Finally, the Southerland Children claim that their removal violated their Fourth Amendment rights to be free from unreasonable seizure.

The district court (Charles P. Sifton, <u>Judge</u>)[2] concluded, <u>inter alia</u>, that Woo was entitled to qualified immunity with respect to all of the claims against him and granted summary judgment in his favor.  We agree with respect to Southerland's substantive due process claim.  We disagree, however, as to Southerland's and the Southerland Children's Fourth Amendment unlawful-search claims, Southerland's and the Southerland Children's procedural due process claims, and the Southerland Children's Fourth Amendment unlawful-seizure claim.  To that extent, we vacate the district court's judgment and remand for further proceedings.

BACKGROUND

The relevant facts are rehearsed in detail in the district court's opinion.  <u>See</u> <u>Southerland v. City of N.Y.</u>, 521 F. Supp. 2d 218 (E.D.N.Y. 2007) ("<u>Southerland II</u>").  They are set forth here only insofar as we think it necessary for the reader to understand our resolution of these appeals.  Where the facts are disputed, we construe the evidence in the light most favorable to the plaintiffs, who are the nonmoving parties.  <u>See,</u> <u>e.g.</u>, <u>SCR Joint Venture L.P. v. Warshawsky</u>, 559 F.3d 133, 137 (2d

---

[2] Judge Sifton passed away while these appeals were pending.

5

Cir. 2009).  We also draw all reasonable factual inferences in the plaintiffs' favor.  See, e.g., id.

### The ACS Investigation

On May 29, 1997, a school guidance counselor reported to the New York State Central Registry Child Abuse Hotline that one of the school's students, Ciara Manning, the then-sixteen-year-old daughter of Diane Manning and plaintiff Southerland, was "emotionally unstable."  The counselor further reported:

> Fa[ther] fails to follow through w[ith] mental health referrals.  On 5/12/97 the ch[ild] swallowed a can of paint.  F[ather] failed to take the ch[ild] for medical attention.  Fa[ther] is unable to control or supervise the ch[ild].  She may be staying out of the home in an i[m]proper enviro[n]ment.

Intake Report at 3, Office of Children and Family Services, Child Protective Services, May 29, 1997 ("Intake Report"), Ex. A to the Declaration of Janice Casey Silverberg (Dkt. No. 168) ("Silverberg Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Sept. 18, 2006).  The Intake Report was transmitted to the Brooklyn Field Office of the ACS.  There, Fritz Balan, a supervisor, assigned the case to defendant Timothy Woo, an ACS caseworker, for investigation.  Woo, who was required by New York law to begin his investigation within 24 hours, did so that day.

He first examined the files of a case pending in that ACS office regarding Ciara's mother, Diane Manning.  Material in those files disclosed that Ciara had several younger half-

6

siblings: the Manning Children. According to Woo, this material also indicated that Ciara was reported to be living with her father, Southerland, at a Brooklyn address, although plaintiffs correctly note the absence of any further evidence as to the source of that information or the time it was received. It is not clear from the record whether Woo was aware that the children referenced in Diane Manning's case file were not related to Southerland and that they did not live with him. See Southerland II, 521 F. Supp. 2d at 222, 224 & n.8.

Woo also contacted the school guidance counselor who had called the child-abuse hotline. According to Woo, the counselor told him that while at school, Ciara had swallowed non-toxic paint, expressed thoughts of suicide, and was generally behaving aggressively and "acting out." Declaration of Timothy Woo ¶ 6 (Dkt. No. 169) ("Woo Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Sept. 18, 2006). Woo's handwritten notes from the conversation indicate that the counselor told Woo that Ciara was having "problems trying to get [her] fa[ther's] attention" and that her "father doesn't approve of the place [where she] is staying." Notes of Timothy Woo at 1 ("Counselor Phone Call Notes"), Ex. A to the Declaration of Michael G. O'Neill (Dkt. No. 182) ("O'Neill Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Dec. 29, 2006). It is disputed whether the counselor also told Woo that Southerland had

7

been unresponsive to the school's stated concerns about Ciara's behavior.

Later the same day, May 29, 1997, Woo attempted to visit Southerland's apartment in Brooklyn. Woo testified that he thought Ciara was residing at that apartment because an open case file on Ciara's mother indicated that Ciara lived with her father. Woo Decl. ¶¶ 5,7. However, as discussed above, Woo's conversation with the counselor earlier in the day suggested that Ciara was not living with her father. When no one answered the door at Southerland's home, Woo left a note containing his contact information.

The following day, May 30, Southerland telephoned Woo. During the course of their conversation, Southerland described Ciara as a runaway who would not obey him. Southerland suggested that he visit the ACS office to discuss the matter with Woo further. The plaintiffs dispute Woo's assertion that during the phone conversation, Southerland indicated that he would not permit Woo to visit Southerland's apartment. Southerland contends that, although he did question why Woo needed to visit the apartment since Ciara did not live there, Southerland nonetheless indicated that he would be willing to make an appointment for Woo to conduct a home visit if Woo insisted.

Southerland visited the ACS office and met with Woo later that day. According to Southerland's deposition testimony,

8

he told Woo that Ciara had run away and that he had obtained several "Persons in Need of Supervision" ("PINS") warrants against her.[3] Woo's case notes indicate that Woo asked Southerland why he had not sought medical attention for Ciara after the paint-swallowing incident. Southerland did not answer the question.[4] See Progress Notes of T. Woo at 1 ("Progress Notes"), Ex. B to O'Neill Decl.

Southerland told Woo that Ciara did not need psychiatric help, and that she "was only acting the way she did to get attention." Woo Decl. ¶ 10; see also Declaration of Fritz Balan ¶ 7 (Dkt. No. 170) ("Balan Decl."), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Sept. 18, 2006). According to Woo, Woo explained to Southerland that various services were available through ACS to assist him and his children, including counseling and help with obtaining food, furniture, and clothing. Woo said Southerland declined. According to Southerland's deposition testimony, however, no such assistance was ever offered.

---

[3] Under New York law, a parent may initiate a proceeding to adjudicate a child as a "person in need of supervision" when that parent alleges that he or she cannot control the child and needs the state's assistance. Such proceedings are governed by Article 7 of the New York Family Court Act. See N.Y. Fam. Ct. Act § 711 et seq.

[4] Southerland later testified that the school contacted him with a medical referral after the paint-swallowing incident, and that he had tried to get Ciara to go to the appointment that was scheduled for her, but that she refused to go.

When Woo said he would need to make a home visit, Southerland replied that it would be "no problem" as long as he was notified in advance. Southerland II, 521 F. Supp. 2d at 223; see also Deposition of Sonny B. Southerland at 207 ("Southerland Dep."), Ex. F to O'Neill Decl. Southerland asserts that Woo stated he would call him to arrange the visit, but that Woo never made such a call.

On June 2, 1997, Woo made a second attempt to examine the Southerland apartment. A woman whose identity was unknown to Woo answered the door. She said that Southerland was not at home. Woo left.

The following day, June 3, Woo again went to the apartment. He heard noises inside, but no one answered the door. Again, he left.

The next day, June 4, Woo went to the apartment for a fourth time. He waited in the hallway for several minutes. Southerland emerged accompanied by five school-aged children: Sonny Jr., Venus, Emmanuel, Nathaniel, and Kiam. Woo wrote down their names in his case notes. Southerland told Woo that he did not have time to talk because he was taking the children to school. Woo gave Southerland an ACS business card and told him that if he continued to be uncooperative, ACS would seek court action. See Southerland II, 521 F. Supp. 2d at 223-24 & n.6; see also Progress Notes at 2.

10

<u>The Removal of the Southerland Children</u>

On June 6, 1997, at the direction of supervisor Balan, Woo applied to the Kings County Family Court for an order to enter the Southerland apartment pursuant to section 1034(2) of the New York Family Court Act.  It is ACS policy to investigate not only the status of the child named in a report of suspected abuse or neglect of the type referred to in section 1034(2), but also to ascertain the condition of any other children residing in the same home.  Woo listed Ciara on the application.  Instead of including the names of the children he had met leaving Southerland's home on June 4, however, he listed the other children of Ciara's mother Diane -- the Manning Children: Eric Anderson, Richy Anderson, Felicia Anderson, Michael Manning, Miracle Manning, and Erica Anderson -- whose names he apparently had obtained from the Diane Manning case files he had reviewed at ACS's Brooklyn Field Office.[5]  The Family Court issued an "Order

---

[5]  Woo listed the names and dates of birth of Ciara and the Manning Children at the top of the application, along with Southerland's name and the address of the Southerland apartment. The body of the application states in its entirety:

> I, Timothy Woo, Caseworker for ACS, am a person conducting a child protective investigation pursuant to the Social Services Law.  I have reasonable cause to believe that the above named children may be found at the above premises.  I have reason to believe that the children are abused or neglected children.  The reasons and the sources of information are as follows:
>
> That on May 12, 1997, Sierra [sic] Manning, age 16 tried to kill herself by swallowing non-toxic paint.

Authorizing Entry" into the Southerland apartment the same day, June 6. See Southerland II, 521 F. Supp. 2d at 224.

Three days later, on the evening of June 9, 1997, pursuant to the Order Authorizing Entry, Woo and at least one other caseworker entered the Southerland apartment with the assistance of officers from the New York City Police Department. Southerland and the Southerland Children were inside the apartment. Woo Decl. ¶¶ 13-15, 19. The district court described what happened next, from Woo's perspective:

> Woo determined that there were six children between the ages of three and nine residing in the apartment. He listed their names [correctly] as Venus, Sonny Jr., Nathaniel, Emmanuel, Kiam, and Elizabeth Felix. Soon after beginning his evaluation of the home, Woo called his supervisor [Balan] on his cell phone, described his observations, and answered his supervisor's questions. Woo reported that the four boys slept on the floor in one bedroom and the two girls slept on a cot in another bedroom. The children

---

Mr. Sutherland [sic] did not take Sierra [sic] to a medical doctor and refused to take Sierra [sic] for psychiatric evaluation.

Mr. Sutherland [sic] has refused to allow the Administration for Children's Services into his home to speak to the above named children.

WHEREFORE, the applicant moves for an order authorizing the Administration for Children's Services accompanied by police to enter the premises to determine whether the above named children are present and to proceed thereafter with its child protective investigation.

Application for Authorization to Enter Premises dated June 6, 1997, Ex. C to Silverberg Decl.

appeared as though they had not been bathed in days and their clothing was malodorous. In the refrigerator, Woo found only beer, a fruit drink, and English muffins. Woo did not examine the contents of the kitchen cupboards. The other caseworker observed that one child, Venus, was limping because of a foot injury. The child stated that she had stepped on a nail. The caseworker concluded that Southerland had not sought medical attention for her. Woo reported that the only light source in the bedroom area was from a blank television screen. Woo observed an electric lamp on the floor, without a shade, connected to an outlet in the living room by means of several extension cords along the floor. Woo reported that another room contained stacks of electronic equipment. Woo and his supervisor concluded that the children's safety was threatened, and Balan directed Woo to remove the children from the home.

Southerland II, 521 F. Supp. 2d at 224-25 (footnotes omitted).[6]

As the district court also observed, the plaintiffs -- relying primarily on later deposition testimony by Southerland -- offer a starkly different description of the conditions in the Southerland home at the time. According to Southerland's testimony, the apartment did not lack proper bedding; the boys

---

[6] The district court summarized Woo's and Balan's stated reasons for removing the Southerland Children as including: that Ciara had attempted suicide; that Southerland had failed to seek medical assistance for Ciara or for Venus; that he had resisted allowing ACS to visit his home; that he had refused to accept ACS services or assistance; that the home lacked food and adequate light; that the use of multiple extension cords for the electronic equipment was dangerous; and that the children were dirty. This combination of factors, according to Woo and Balan, "established in [their] minds that Southerland could not parent the children responsibly." Southerland II, 521 F. Supp. 2d at 225.

13

had a bunk bed in their room, although they preferred to sleep on yellow foam sleeping pads on the floor. Id. at 225 n.10. The children were not dirty; Southerland testified that he laundered the children's clothing about once a week and bathed the children daily. Id. at 225 n.11. There was food in the refrigerator, and it is also a reasonable inference from Southerland's testimony that there was food in the cupboards (which Woo did not examine), because Southerland testified that groceries for the household were purchased on a regular basis. Id. at 225 n.12. The household did not lack adequate lighting; Southerland testified that he had a lamp plugged into a wall in each room, id. at 225 n.14, and that there were no extension cords running from room to room. Finally, although Southerland does not dispute that Venus had a foot injury, the plaintiffs stress Woo's concession that he did not personally observe the injury during his assessment of the home.[7] Id. at 225 n.13.

In the early morning hours of June 10, 1997, at Balan's direction, Woo removed the Southerland Children from the Southerland home. Woo took them to the ACS pre-placement emergency shelter and arranged for emergency foster care. Id. at 226.

_____

[7] After the Southerland Children's removal, Woo brought Venus "to a hospital based on the instructions of a nurse at the agency that first examined the children. At the hospital, the wound was dressed and the child received a tetanus shot." Southerland II, 521 F. Supp. 2d at 225 n.13.

14

At some point -- it is not clear from the record exactly when -- Woo interviewed Ciara Manning, whom he had found living at the home of her friend. Ciara told Woo that her father had sexually abused her and threatened to kill her if she told anyone about the abuse -- allegations she later recanted.[8] The Southerland Children also complained of various kinds of abuse and mistreatment at the hands of Southerland and his companion, Vendetta Jones. The allegations concerning the sexual abuse of Ciara were included in a verified petition filed by ACS with the Family Court on June 13, 1997, and that petition was amended on June 27, 1997, to add allegations concerning corporal punishment of the Southerland Children. The petitions commenced child-protective proceedings under Article 10 of the New York Family Court Act, §§ 1011 et seq., through which ACS sought to have the Southerland Children adjudicated as abused, neglected, or both.

On July 1, 1998, more than a year after the children were removed from the Southerland home, the Kings County Family Court concluded following a five-day fact-finding hearing that

---

[8] On March 14, 2007, Southerland made a pro se submission to the district court requesting that the court take judicial notice of a number of documents, including a declaration by Ciara Manning that had been sworn on April 20, 2002. In that declaration, Ciara stated that Southerland had never molested or abused her in any way and that the statements she made previously to Woo and to the Family Court to that effect were false. See Pro Se Submission of Sonny B. Southerland at 26-27 (Dkt. No. 192), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Mar. 14, 2007).

15

Southerland had engaged in excessive corporal punishment of the Southerland Children and that he had abused and neglected them. The court also concluded that he had sexually abused his daughter Ciara. The court ordered that the Southerland Children remain in foster care, where they had resided since the June 1997 removal. The New York Appellate Division, Second Department, affirmed these orders, In re Ciara M., 273 A.D.2d 312, 708 N.Y.S.2d 717 (2d Dep't 2000), and the New York Court of Appeals denied leave to appeal, 95 N.Y.2d 767, 740 N.E.2d 653, 717 N.Y.S.2d 547 (2000).

In March 2004, nearly seven years after their removal from the Southerland home, Sonny Jr. and Venus were permitted to return to live with Southerland. Some seven months thereafter, Nathaniel and Emmanuel were discharged from the juvenile justice system by the Office of Children and Family Services and also returned to the Southerland home. There is nothing in the record to suggest that Kiam or Elizabeth ever returned to live with Southerland.

However strongly the facts of mistreatment found by the Family Court at trial in July 1998 may support Woo's perceptions about the dangers to the Southerland Children of their remaining with Southerland, virtually none of this information was in Woo's possession when he effected the June 9, 1997, entry and removal, as the district court correctly observed. See Southerland II,

16

521 F. Supp. 2d at 226 n.19.  Although Woo mentions in his briefing that the Family Court eventually determined that Ciara and the Southerland Children had been abused and neglected, he does not dispute the plaintiffs' assertion that these subsequently determined facts should not bear upon our consideration of whether Woo's actions in effecting the removal were constitutional.  We therefore need not consider the relevance, if any, of these subsequent events on the plaintiffs' ability to recover on their constitutional claims.[9]

### Prior Federal Court Proceedings

In June 1999, some two years after the removal and while the Southerland Children remained in foster care, Southerland, on behalf of himself and his children, filed a pro se complaint in the United States District Court for the Eastern

---

[9] It appears to be an unresolved question of law in this Circuit whether a plaintiff parent is permitted to recover damages on a theory of substantive due process against a caseworker under circumstances where, although the initial removal lacked a reasonable basis, the child is nonetheless ultimately found to have been abused or neglected by the parent following a family-court fact-finding hearing.  Under such circumstances, it is an open question whether a defendant caseworker's conduct in removing the child -- even where the caseworker initially lacked a reasonable basis for doing so -- can be said to be "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,'"  Okin v. Vill. of Cornwall-on-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998)).  However, because Woo has not made this argument in this case, and because we ultimately affirm the dismissal of Southerland's substantive due process claim on other grounds, we need not consider this question at this time. See also note 31, infra.

17

District of New York against more than forty defendants for the allegedly wrongful removal of the Southerland Children from his home.  On February 1, 2000, the district court (Charles P. Sifton, _Judge_) granted the defendants' motion to dismiss on grounds that included failure to state a claim, failure to plead certain matters with particularity, lack of subject-matter jurisdiction, and Eleventh Amendment immunity.  _See_ Opinion & Order (Dkt. No. 43), _Southerland v. City of N.Y._, No. 99-cv-3329 (E.D.N.Y. Feb. 2, 2000), Ex. G to Silverberg Decl.

Southerland appealed.  We affirmed in part, reversed in part, and remanded.  We ruled, _inter alia_, that the district court had erred in dismissing Southerland's claims under 42 U.S.C. § 1983 relating to the seizure and removal of the Southerland Children.  _See Southerland v. Giuliani_, 4 F. App'x 33, 36 (2d Cir. 2001) (summary order) ("_Southerland I_").  We concluded that the _pro se_ complaint stated valid claims for violations of both the substantive and procedural components of the Fourteenth Amendment's Due Process Clause.  _See id._ at 36-37. We "emphasize[d] that our holding [wa]s limited to the claims made directly by Sonny Southerland," noting that "[a]lthough the children probably have similar claims, we have held that a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child."  _Id._ at 37 (citation, footnote, and internal quotation marks omitted).  We therefore

18

"le[ft] it to the district court upon remand to determine whether Southerland should be given a chance to hire a lawyer for his children or to seek to have one appointed for them."  Id.

On remand, the district court appointed counsel to represent both Southerland and the Southerland Children.[10] Southerland II, 521 F. Supp. 2d at 227.  In November 2002, through counsel, Southerland and the Southerland Children jointly filed an amended complaint, id. at 221 & n.1, asserting nine claims under 42 U.S.C. § 1983 against Woo and the City of New York, id. at 221 n.2.[11]

In the amended complaint, Southerland asserts four separate claims against Woo.[12]  First, he brings an unlawful-

_____

[10] Michael G. O'Neill was appointed as counsel for both Southerland and the Southerland Children.  In April 2004, Southerland resumed proceeding pro se before the district court, while Mr. O'Neill continued to represent the Southerland Children (including Venus and Sonny Jr., even after they were no longer minors).  In April 2004, the district court also appointed a guardian ad litem to represent the Southerland Children's interests.  See Southerland II, 521 F. Supp. 2d at 221 n.1.  In the instant appeals, Southerland represents himself pro se, while Mr. O'Neill continues to represent the Southerland Children.

[11]  The amended complaint did not name as defendants or assert any claims against any of the other thirty-nine defendants that had been named by Southerland in his original pro se complaint.  Additionally, although Ciara was identified as a plaintiff in the original complaint, she was dropped from the suit when the amended complaint was filed.

[12] The amended complaint also joins nine John Doe defendants, including several persons who "supervis[ed], monitor[ed] and assist[ed] Woo in his actions with respect to the [Southerland] Children."  Am. Compl. ¶ 39 (Dkt. No. 75), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Nov. 22,

19

search claim, asserting that Woo's entry into his home "without privilege, cause or justification" violated the Fourth Amendment. Am. Compl. ¶¶ 40-41 (Dkt. No. 75), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Nov. 22, 2002). Southerland brings a second Fourth Amendment unlawful-search claim for Woo's remaining in his home even after discovering that the children listed on the Order Authorizing Entry were not there. Third, Southerland asserts a Fourteenth Amendment procedural due process claim for removal of the Southerland Children from his home without a court order and in the absence of an immediate threat of harm to their lives or health. Finally, Southerland asserts a substantive due process claim, also under the Fourteenth Amendment, for Woo's removal of the Southerland Children absent a reasonable basis for doing so.

The amended complaint also interposes various claims on behalf of the Southerland Children. First, the Children assert

---

2002). The complaint asserts that "said Does are individually liable to [Southerland] for the deprivation of his constitutional rights and the constitutional rights of the [Southerland] Children as alleged herein." Id.

In their briefing on appeal, the plaintiffs do not address these John Doe defendants. We conclude that the plaintiffs have abandoned their claims against the John Does. We note that even if the plaintiffs now sought to amend their complaint to identify the John Doe defendants, the claims against the newly named defendants would be time-barred. See Tapia-Ortiz v. Doe, 171 F.3d 150, 151-52 (2d Cir. 1999) (per curiam); Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 468-70 (2d Cir. 1995), modified, 74 F.3d 1366 (2d Cir. 1996).

20

the same procedural due process claim under the Fourteenth Amendment as does Southerland. Second, they bring a substantive due process claim under the Fourteenth Amendment on the theory that they were removed from their home without reasonable basis. The district court recharacterized the latter claim as arising under the Fourth Amendment's guarantee of protection against unlawful seizure.[13] See Southerland II, 521 F. Supp. 2d at 230 n.24. Finally, the district court construed the amended complaint as asserting on behalf of the Children the same two Fourth Amendment unlawful-search claims as were asserted by Southerland, see id. at 233-34 & n. 28, a decision that Woo has not challenged on appeal.

Southerland and the Southerland Children also bring several claims against the City of New York. Southerland asserts that the City is liable under 42 U.S.C. § 1983 for the removal of the Southerland Children insofar as that removal was conducted pursuant to two alleged official City policies: to remove children without a reasonable basis, and to remove children without a court order despite the absence of any immediate threat of harm to their lives or health. Southerland and the

---

[13] In so doing, the district court relied upon our statement, when the case was previously on appeal, that "[t]he children's claims for unreasonable seizure would proceed under the Fourth Amendment rather than the substantive component of the Due Process Clause." Southerland I, 4 F. App'x at 37 n.2 (citing Kia P. v. McIntyre, 235 F.3d 749, 757-58 (2d Cir. 2000)).

21

Southerland Children also allege that high-ranking policymakers within the City's police department knew or should have known that the City's failure to train police officers accompanying ACS employees on home visits and investigations would deprive New York City residents of their constitutional rights.[14]

On the defendants' motion for summary judgment, the district court concluded that Woo was entitled to qualified immunity as to all of the claims against him. With respect to the Fourth Amendment unlawful-search claims, the court concluded that the false and misleading statements made by Woo in his application for the Order Authorizing Entry did not strip him of qualified immunity because the plaintiffs could not show that these statements were necessary to the finding of probable cause to enter the home. Southerland II, 521 F. Supp. 2d at 230-31. The court decided that qualified immunity was warranted because "a corrected affidavit specifying all of the information known to Woo establishes an objective basis that would have supported a reasonable caseworker's belief that probable cause existed." Id. at 231 (brackets, citation, and internal quotation marks omitted).

---

[14] The district court later permitted the Southerland Children to assert their failure-to-train claim against the City not only with respect to the police, but also with respect to ACS. See Southerland II, 521 F. Supp. 2d at 235 n.34.

With respect to the Southerland Children's Fourth Amendment unlawful-seizure claim, and the procedural due process claims brought by both sets of plaintiffs, the district court decided that qualified immunity shielded Woo from liability because his actions pre-dated the clear establishment of law in this context, which in its view did not occur until this Court's decision in Tenenbaum v. Williams, 193 F.3d 581, 596-97 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000). See Southerland II, 521 F. Supp. 2d at 231-32.

Lastly, with regard to Southerland's substantive due process claim, the district court concluded that Woo was entitled to qualified immunity because "it was objectively reasonable for [him] to conclude that Southerland's substantive due process rights were not violated" when Woo removed the Southerland Children from the home, because "[b]rief removals of children from their parents generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." Id. at 232 (brackets and internal quotation marks omitted).

Notwithstanding the district court's conclusion that Woo was entitled to qualified immunity as to every claim asserted against him, the court proceeded to consider, in the alternative, the underlying merits of the plaintiffs' various claims. The

23

court decided that even in the absence of immunity, Woo would be entitled to summary judgment with respect to the plaintiffs' Fourth Amendment unlawful-search claims and Southerland's substantive due process claim. Specifically, with respect to the Fourth Amendment unlawful-search claims, the district court decided that "no reasonable juror could infer that Woo knowingly and intentionally made false and misleading statements to the family court in order to receive an order authorizing his entry into the Southerland home." Id. at 233. With respect to Southerland's substantive due process claim, the court concluded that "no reasonable juror could find that the removal of the children from their home in order to verify that they had not been neglected or abused was so 'shocking, arbitrary, and egregious' that Southerland's substantive due process rights were violated." Id. at 234-35 (citation omitted).

The district court concluded that the City was also entitled to summary judgment on all of the claims against it. See Southerland II, 521 F. Supp. 2d at 235-39. The plaintiffs do not appeal from that portion of the judgment and therefore have abandoned their claims against the City. See LoSacco v. City of Middletown, 71 F.3d 88, 92-93 (2d Cir. 1995).

The district court determined, however, that without qualified immunity protection, summary judgment would not be appropriate on the merits of the procedural due process claims

24

brought by both Southerland and the Southerland Children because, "[a]lthough defendants argue that the 'totality of the circumstances' Woo encountered in the Southerland home required an ex parte removal, they fail to explain why there was not sufficient time for Woo to seek a court order removing the children." See Southerland II, 521 F. Supp. 2d at 235 n.31. Nor would summary judgment be appropriate on the merits of the Southerland Children's Fourth Amendment unlawful-seizure claim, the district court said, because the defendants could not explain "why the particular circumstances that Woo encountered in the Southerland home established that there was imminent danger to the children's life or limb requiring removal in the absence of a court order." Id. at 234 n.29.

Both Southerland and the Southerland Children now appeal from the dismissal of each of their claims against Woo, with the exception of one of their Fourth Amendment claims. The plaintiffs have not appealed the district court's adverse ruling as to their claim that Woo violated the Fourth Amendment by remaining in their home even after determining that the children listed on the Order Authorizing Entry were not present.

We affirm with respect to the dismissal of Southerland's substantive due process claim. We vacate and remand with respect to Southerland's and the Southerland Children's Fourth Amendment unlawful-search claims; Southerland's

25

and the Southerland Children's procedural due process claims; and the Southerland Children's unlawful-seizure claim.

DISCUSSION

I.   Standard of Review

"We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the non-moving part[ies] and drawing all reasonable inferences in [their] favor."  Allianz Ins. Co. v. Lerner, 416 F.3d 109, 113 (2d Cir. 2005).  "[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law."  D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.), cert. denied, 524 U.S. 911 (1998); see Fed. R. Civ. P. 56(a).

II.   Principles of Qualified Immunity

Qualified immunity shields public officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "In general, public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."  Holcomb v. Lykens, 337 F.3d 217,

26

220 (2d Cir. 2003) (internal quotation marks omitted).  A right is "'clearly established'" when "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Qualified immunity is an "affirmative defense," Gomez v. Toledo, 446 U.S. 635, 636, 639-41 (1980), and "it is incumbent upon the defendant to plead[] and adequately develop" that defense, Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007) (internal quotation marks omitted).

In this Circuit, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful."  Taravella v. Town of Wolcott, 599 F.3d 129, 134 (2d Cir. 2010) (some internal quotation marks omitted); accord Walczyk v. Rio, 496 F.3d 139, 154 n.16 (2d Cir. 2007).  In other words, a caseworker is also entitled to qualified immunity "if 'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context."  Manganiello v. City of N.Y., 612 F.3d 149, 165 (2d Cir. 2010) (quoting Walczyk, 496 F.3d at 154); see also Tenenbaum, 193 F.3d at 605 (applying same principle to "child welfare workers").  But see Taravella, 599 F.3d at 136-41

27

(Straub, J., dissenting) (stating that this prong of the qualified-immunity analysis "has no basis in Supreme Court precedent and has served to confuse the case law in this area"); Okin, 577 F.3d at 433 n.11 ("[O]nce a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for a police officer who violated this clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."); Walczyk, 496 F.3d at 165-71 (Sotomayor, J., concurring) ("[W]hether a right is clearly established is the same question as whether a reasonable officer would have known that the conduct in question was unlawful.") (emphasis in original).

III. Overview of Constitutional Principles Relating to the State's Removal of Children from Their Homes

As we observed in a decision post-dating the events at issue in these appeals, "[p]arents . . . have a constitutionally protected liberty interest in the care, custody and management of their children." Tenenbaum, 193 F.3d at 593; see also Troxel v. Granville, 530 U.S. 57, 65-66 (2000) (collecting cases concerning the "fundamental right of parents to make decisions concerning the care, custody, and control of their children"). "[C]hildren have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily family association." Kia P. v.

28

McIntyre, 235 F.3d 749, 759 (2d Cir. 2000) (brackets and internal quotation marks omitted), cert. denied, 534 U.S. 820 (2001); see also Duchesne v. Sugarman, 566 F.2d 817, 825 (2d Cir. 1977) ("Th[e] right to the preservation of family integrity encompasses the reciprocal rights of both parent and children."). The state's removal of a child from his or her parent may therefore give rise to a variety of cognizable constitutional claims.

First, both the parents and the children may have a cause of action for violation of the Fourteenth Amendment under a theory of denial of procedural due process. The Fourteenth Amendment imposes a requirement that except in emergency circumstances, judicial process must be accorded both parent and child before removal of the child from his or her parent's custody may be effected. See, e.g., Kia P., 235 F.3d at 759-60; Tenenbaum, 193 F.3d at 593-94; Duchesne, 566 F.2d at 825-26. Both Southerland and the Southerland Children have asserted such a procedural due process claim against Woo in this case.

Second, a parent may also bring suit under a theory of violation of his or her right to substantive due process. Southerland does so here. Parents have a "substantive right under the Due Process Clause to remain together [with their children] without the coercive interference of the awesome power of the state." Tenenbaum, 193 F.3d at 600 (internal quotation marks omitted); see also, e.g., Anthony v. City of N.Y., 339 F.3d

29

129, 142-43 (2d Cir. 2003); Kia P., 235 F.3d at 757-58. Such a claim can only be sustained if the removal of the child "would have been prohibited by the Constitution even had the [parents] been given all the procedural protections to which they were entitled." Tenenbaum, 193 F.3d at 600 (emphasis deleted). In other words, while a procedural due process claim challenges the procedure by which a removal is effected, a substantive due process claim challenges the "fact of [the] removal" itself. Bruker v. City of N.Y., 92 F. Supp. 2d 257, 266-67 (S.D.N.Y. 2000).

"Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process." Kia P., 235 F.3d at 757-58 (quoting Conn v. Gabbert, 526 U.S. 286, 293 (1999)) (brackets and internal quotation marks omitted). For child removal claims brought by the child, we have concluded that the Constitution provides an alternative, more specific source of protection than substantive due process. When a child is taken into state custody, his or her person is "seized" for Fourth Amendment purposes. The child may therefore assert a claim under the Fourth Amendment that the seizure of his or her person was "unreasonable." U.S. Const. amend. IV; see Tenenbaum, 193 F.3d at 602.

A Fourth Amendment child-seizure claim belongs only to the child, not to the parent, although a parent has standing to assert it on the child's behalf. Tenenbaum, 193 F.3d at 601 n.13. In accordance with our order in Southerland I, 4 F. App'x at 37 n.2, the district court therefore determined that the Southerland Children's substantive due process claim should be construed instead as a Fourth Amendment unlawful-seizure claim. See Southerland II, 521 F. Supp. 2d at 230 n.24.

Finally, depending on the circumstances in which a removal occurs, other Fourth Amendment claims might also be viable. Here, Southerland and the Southerland Children asserted two Fourth Amendment claims for unlawful search: one claim relating to Woo's entry into the Southerland home, and one (now abandoned) relating to Woo's remaining in the home even after determining that the Manning Children were not present. Both claims were based on an allegation that Woo made false statements to the Family Court in order to obtain the Order Authorizing Entry, and therefore that there was no valid judicial authorization for him to carry out a search of the Southerland apartment. We begin our analysis with the unabandoned search claim based on Woo's allegedly unlawful entry.

IV. The Fourth Amendment Unlawful-Search Claims

The district court determined that summary judgment was warranted on the plaintiffs' Fourth Amendment unlawful-search

31

claims on two separate grounds.  First, the district court concluded that Woo was entitled to qualified immunity under the "corrected affidavit" doctrine.  See Southerland II, 521 F. Supp. 2d at 230-31.  Second, the district court decided that Woo was entitled to summary judgment on the merits because no reasonable juror could find that Woo had knowingly made false or misleading statements in seeking to obtain the Order Authorizing Entry.  Id. at 233.  We disagree with both conclusions.

A.   The Corrected-Affidavit Doctrine

The plaintiffs argue that the district court erred in its application of the corrected-affidavit doctrine, under which a defendant who makes erroneous statements of fact in a search-warrant affidavit is nonetheless entitled to qualified immunity unless the false statements in the affidavit were "necessary to the finding of probable cause."  Martinez v. City of Schenectady, 115 F.3d 111, 115 (2d Cir. 1997) (internal quotation marks omitted).  In order to determine whether false statements were "necessary to the finding of probable cause," the court must "put aside allegedly false material, supply any omitted information, and then determine whether the contents of the 'corrected affidavit' would have supported [the] finding . . . ."  Id. (citation and internal quotation marks omitted).  In applying the corrected-affidavit doctrine, qualified immunity is warranted only if, after correcting for the false or misleading statements,

32

the affidavit accompanying the warrant was sufficient "to support a reasonable officer's belief that probable cause existed."  Id. (internal quotation marks omitted).

We have observed that the materiality of a misrepresentation or omission in an application for a search warrant is a mixed question of law and fact.[15]  Velardi v. Walsh, 40 F.3d 569, 574 (2d Cir. 1994).  "The legal component depends on whether the information is relevant to the probable cause determination under controlling substantive law."  Id.  "[T]he weight that a neutral magistrate would likely have given such information," however, is a question for the factfinder.  Id. In such circumstances, a court may grant summary judgment to a defendant based on qualified immunity only if "the evidence, viewed in the light most favorable to the plaintiffs, discloses no genuine dispute that a magistrate would have issued the warrant on the basis of the corrected affidavits."  Walczyk, 496 F.3d at 158 (emphasis and internal quotation marks omitted). Here, we cannot conclude as a matter of law -- although a trier of fact might conclude after an evidentiary hearing or the district court might conclude as a matter of law in light of additional evidence -- that the Family Court, in deciding whether

---

[15] In child-abuse investigations, a Family Court order is equivalent to a search warrant for Fourth Amendment purposes. See Nicholson v. Scoppetta, 344 F.3d 154, 176 (2d Cir. 2003); Tenenbaum, 193 F.3d at 602.

there was "probable cause to believe that an abused or neglected child may [have] be[en] found [in the Southerland home]," N.Y. Fam. Ct. Act § 1034(2), would have issued the order had a corrected affidavit been presented to it.

The district court, which "[a]ssum[ed] for purposes of the qualified immunity defense that Woo made false and misleading statements" in applying for the Order Authorizing Entry, Southerland II, 521 F. Supp. 2d at 230, correctly noted that the plaintiffs "would still have to demonstrate that those statements were necessary to the finding of probable cause for qualified immunity not to attach to Woo's actions," id. at 230-31 (citation and internal quotation marks omitted). The court determined that Woo was entitled to qualified immunity based on its conclusion that a corrected affidavit, containing all of the information available to Woo at the time the affidavit was made, would have supported a finding of probable cause to enter the home under the applicable substantive law. Id. at 231.

We disagree. Section 1034(2) of the New York State Family Court Act, which provides the evidentiary standard for a showing sufficient for the issuance of an investigative order, governed Woo's application to obtain the Order Authorizing Entry. The district court, in its September 2007 decision, cited the statute as it had been amended in January 2007. See id. at 224 n.7. But under the version of the statute that governed at the

34

time of Woo's application, unlike the version of the statute in effect in 2007, the affiant was required to demonstrate "probable cause to believe that an abused or neglected child may be found on premises," N.Y. Fam. Ct. Act § 1034(2) (McKinney 1997) (emphasis added), presumably meaning the "premises" identified in the application submitted to the Family Court.[16]

The district court should have engaged in its corrected-affidavit analysis with reference to the law applicable at the time of the events in question.  The children that Woo listed on his application for the Order Authorizing Entry -- the Manning Children and Ciara -- were children who did not reside "on premises" in the Southerland home.

The district court concluded that "a properly made application would still list Ciara Manning on the application because Southerland is her father and was the parent legally responsible for her care, even if she had run away."  Southerland II, 521 F. Supp. 2d at 231.  That may be relevant to an inquiry under the statute as amended in 2007, but it is not relevant to the appropriate question under the applicable version of the law at the time of the entry: whether there existed probable cause

---

[16] The defendants do not argue that a corrected affidavit would have supported a finding of probable cause under the Fourth Amendment even if it would not have met the evidentiary standard set out in section 1034(2) of the applicable New York statute. We therefore do not consider whether Woo would have had constitutionally adequate cause to enter the apartment notwithstanding the absence of a valid warrant or its equivalent.

for Woo to believe that Ciara Manning could be found "on premises" at the Southerland home. In fact, she, like the Manning Children, was not "on premises." And Woo had reason to know that she was not -- from the information in the initial Intake Report transmitted to Woo; from the guidance counselor's statement to Woo that Southerland did not approve of the place where Ciara was staying; and from Southerland's own statements during his May 30 telephone conversation with Woo that Ciara was a runaway and did not live at his home.[17]

The plaintiff children point out that there were other deficiencies in the district court's corrected-affidavit analysis that undermine the court's conclusion that the information known to Woo at the time he applied for the Order Authorizing Entry

---

[17] The defendants also argue, with respect to the probable cause determination, that irrespective of the requirements of New York Family Court Act § 1034(2), Woo was required to visit the Southerland home under a provision of the New York Social Services Law that requires that, within twenty-four hours of receipt of a "report[] of suspected child abuse or maltreatment" as provided for under New York Social Services Law § 424(1), ACS must undertake an investigation that includes "an evaluation of the environment of the child named in the report and any other children in the same home," id. § 424(6)(a). However, considering that Woo had reason to know that Ciara, the child identified in the report, was not living at the Southerland home -- and, indeed, reason to know that none of the children named in his application to the Family Court were living there -- his reliance on this provision of the Social Services Law fails. If Ciara was not living "on premises" at the Southerland home, Woo was not entitled to enter the home to evaluate this "environment," nor to evaluate the other children living there, for he had not received any information suggesting that any child other than Ciara might be at risk.

36

would have supported a finding of probable cause. For example, Woo's application stated that Ciara "tried to kill herself by swallowing non-toxic paint," and that Southerland "did not take [Ciara] to a medical doctor and refused to take [Ciara] for psychiatric evaluation." Application for Authorization to Enter Premises dated June 6, 1997, at 1 ("June 6 Application"), Ex. C to Silverberg Decl. But the plaintiff children argue that the application omitted several relevant facts that, according to Southerland's version of events, were known to Woo at that time: that the paint-swallowing incident took place at school, not at home; that Southerland was willing to obtain treatment for his daughter, but had trouble doing so, precisely because she was not living in his home; and that Southerland had attempted to assert control over his daughter by applying for PINS warrants. Southerland Children's Br. at 30-31; see also id. at 28-36 (disputing additional assertions of fact, such as whether the swallowing of paint indeed was a suicide attempt). As the plaintiff children put it:

> Woo's omission of the fact that the incident took place at school allowed the court to assume that this suicide attempt took place in Southerland's residence. The overall picture painted by Woo is that Southerland's daughter attempted to kill herself, that Southerland did nothing about it, and refused to let others do something about it as well. By omitting the fact that the daughter was not even living at the Southerland apartment, Woo gave the family court the impression that it was necessary to allow Woo to enter the

37

apartment in order to render assistance to a suicidal teenager in the home of a parent who could not be bothered to help her and who prevented the efforts of ACS to provide help to her.

Id. at 31-32.  The district court included much of this information in its recitation of facts, Southerland II, 521 F. Supp. 2d at 222-23 & nn.4 & 5, but it did not factor these considerations into its application of the corrected-affidavit doctrine.

For these reasons, application of the corrected-affidavit doctrine does not as a matter of law preclude liability in this case.

B.   Knowing or Reckless Misstatements of Fact

The district court also concluded that even if the corrected-affidavit doctrine did not apply, summary judgment was appropriate because, on the merits, "no reasonable juror could infer that Woo knowingly and intentionally made false and misleading statements to the family court in order to receive an order authorizing his entry into the Southerland home." Southerland II, 521 F. Supp. 2d at 233.  Based on that premise, the district court concluded that "the [O]rder [Authorizing Entry] was issued with probable cause and Woo's entry into and search of Southerland's home did not violate plaintiffs' Fourth Amendment rights."  Id.

38

We disagree. If the district court were correct that Woo did not knowingly make false and misleading statements, that would entitle Woo to qualified immunity, but would not necessarily render his underlying conduct lawful -- the issue the court was addressing. When a person alleges a Fourth Amendment violation arising from a search executed by a state official, "the issuance of a search warrant . . . creates a presumption that it was objectively reasonable for the [defendant] to believe that the search was supported by probable cause" so as to render the defendant qualifiedly immune from liability. Martinez, 115 F.3d at 115. To defeat the presumption of reasonableness, a plaintiff must make "a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was necessary to the finding of probable cause" for which the warrant was issued. Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) (internal quotation marks omitted), cert. denied, 505 U.S. 1221 (1992).

We need not consider further whether the district court erred by confusing the qualified immunity and merits analyses, however, because we also do not agree with the district court's conclusion that no reasonable juror could find that Woo did not knowingly or recklessly make false statements -- the immunity inquiry. We think that several disputed facts, taken together

and viewed in the light most favorable to the plaintiffs, would permit a reasonable factfinder to find otherwise.

First, there is substantial evidence, viewed in the light most favorable to the plaintiffs, that Woo knew or had reason to know that Ciara was not residing at the Southerland home when he applied for the Order Authorizing Entry. On appeal, Woo appears to assert that he was justified in searching for Ciara at the Southerland home because, according to ACS's Diane Manning case files, "Ciara was reported to be living with her father, Sonny B. Southerland, Sr. at his address at 10 Amboy St. Brooklyn." Woo Decl. ¶ 5. Although the plaintiffs deny that the substance of this report was accurate, they do not effectively dispute that the information was contained in ACS's records,[18] nor do they dispute that Southerland's home was, in fact, Ciara's legal residence. To the contrary, they affirmatively allege in their complaint that Southerland was the parent with "physical and legal custody" at the relevant time. Am Compl. ¶¶ 9-10.

If Woo had no further knowledge or reliable information about Ciara's whereabouts, we think -- having regard to the "factual and practical considerations of everyday life," Gates, 462 U.S. at 231 (internal quotation marks omitted) -- that Woo

_____

[18] The plaintiffs also do not explicitly argue that this information had become "stale." See generally Walczyk, 496 F.3d at 162 (enumerating Fourth Amendment standards for staleness); United States v. Ortiz, 143 F.3d 728, 732-33 (2d Cir. 1998) (same), cert. denied, 525 U.S. 910 (1998).

40

might well have had probable cause to believe that Ciara was to be found at Southerland's apartment -- her custodial parent's home. Cf. Manganiello, 612 F.3d at 161 (probable cause may exist even where an officer "relied on mistaken information, so long as it was reasonable for him to rely on it"). Nor, we think, was the fact that both Southerland and the school counselor informed Woo that Ciara did not live with Southerland alone sufficient to establish that Woo believed otherwise. Cf. Robison v. Via, 821 F.2d 913, 922 (2d Cir. 1987) ("[T]he officials need not defer action [on a child-abuse report] merely on account of a parent's protestations of innocence or promises of future protection . . . .").

But there is more. At his deposition, Woo appeared to concede that he did know with some certainty -- if not by the time of applying for the Order Authorizing Entry on June 6, then by the time of executing that Order on June 9 -- that Ciara did not reside with Southerland and would not be found at his home. When asked by plaintiffs' counsel why he had persisted in seeking to enter the Southerland apartment once he knew that Ciara Manning was not staying there, Woo -- plainly accepting the factual premise of the question -- explained that he had sought to enter in order to, among other things, "contact [Southerland] to find out about [Ciara's] whereabouts," Deposition of Timothy Woo at 17 ("Woo Dep."), Ex. D to O'Neill Decl.; to "a[ss]ess the

41

safety of the children's home environment," id.; to look for "[t]he Manning children," id. at 18-19; and to investigate the well-being of the children who Woo knew were residing with Southerland, id. at 20-22. In his declaration tendered in support of the defendants' summary-judgment motion, moreover, Woo did not identify when it was that he found Ciara living in the home of her friend, but instead stated only that his interview of Ciara occurred "[d]uring the course of the investigation" when he went to the home. Woo Decl. ¶ 23. His statements thus strongly support the notion that Woo was well aware that, wherever Ciara was, it was unlikely to be in the Southerland Apartment.[19]

Second, evidence in the record, again viewed in the light most favorable to the plaintiffs, would permit a reasonable juror to conclude that Woo knowingly or recklessly misrepresented the nature of the paint-swallowing incident in his application. About one week before June 6, Woo learned from a school counselor that Ciara had "swallowed non-toxic paint at school" and had been "acting out and expressing thoughts of suicide." Woo Decl. ¶ 6. Although the counselor informed Woo that Southerland had failed to seek mental health treatment for Ciara, see id., before Woo made his application to Family Court, Southerland had explained

_____

[19] Indeed, Woo does not explicitly challenge the plaintiffs' repeated assertion that before the events of June 9, 1997, Woo knew for a fact that Ciara was not staying in Southerland's apartment.

42

to Woo that the reason he had not taken Ciara for treatment was that she did not reside with Southerland and did not listen to him, id. ¶ 8. Yet Woo's application represented to the Family Court that Ciara "tried to kill herself by swallowing non-toxic paint" and that Southerland "did not take [her] to a medical doctor and refused to take [her] for psychiatric evaluation." June 6 Application at 1. A reasonable trier of fact might find those statements to be materially misleading insofar as they characterize Ciara's paint-swallowing as a suicide attempt; fail to note that the incident occurred at school rather than in Southerland's home; and omit the fact that Ciara may have been living outside the home and free from Southerland's control.

Finally, the district court overlooked the parties' dispute concerning Woo's knowledge about which children resided in the Southerland apartment. The district court stated that Woo "had reason to believe that the Manning children would be found in the Southerland apartment because of a separate investigation of the Manning children and his personal observation that there were other children in the Southerland home who had not yet been positively identified." Southerland II, 521 F. Supp. 2d at 233. But, as the district court opinion elsewhere observes, on June 4, 1997 -- two days before he applied for the Order Authorizing Entry -- Woo met the Southerland Children, not the Manning Children, emerging from the Southerland apartment and wrote down

43

their names.  See id. at 223-24 & n.6.  We think that there is a triable issue of fact as to whether Woo in fact believed, as he wrote in his application to the Family Court, that it was the Manning Children who were in the Southerland home, or whether he recklessly confused or knowingly conflated the two groups of children.

Although these alleged misrepresentations may turn out to be no more than accidental misstatements made in haste, the plaintiffs have nonetheless made a "substantial preliminary showing" that Woo knowingly or recklessly made false statements in his application for the Order Authorizing Entry.  Golino, 950 F.2d at 870 (internal quotation marks omitted).  This showing rebuts the presumption of reasonableness that would otherwise, at the summary judgment stage, entitle Woo to qualified immunity, a defense on which he has the burden of proof.

In sum, because we conclude that genuine issues of material fact exist, both as to whether Woo knowingly or recklessly made false statements in his affidavit to the Family Court and as to whether such false statements were necessary to the court's finding of probable cause, we vacate the district court's grant of summary judgment on the plaintiffs' Fourth Amendment unlawful-search claims.

Once again, we note that a trier of fact might, after review of the record (whether or not augmented by additional

44

evidence), conclude that the errors in the June 6 Application were either accidental or immaterial. We vacate the grant of summary judgment because, on the current record, we cannot reach that conclusion ourselves as a matter of law.

V.    The Plaintiffs' Procedural Due Process Claims

Southerland and the Southerland Children each assert a procedural due process claim against Woo. The district court held that Woo was entitled to qualified immunity on these claims. We disagree.

A.    Procedural Due Process in the Child-Removal Context

"'As a general rule . . . before parents may be deprived of the care, custody, or management of their children without their consent, due process -- ordinarily a court proceeding resulting in an order permitting removal -- must be accorded to them.'" Nicholson, 344 F.3d at 171 (quoting Tenenbaum, 193 F.3d at 593). "However, 'in emergency circumstances, a child may be taken into custody by a responsible State official without court authorization or parental consent.'" Id. (quoting Tenenbaum, 193 F.3d at 594). "'If the danger to the child is not so imminent that there is reasonably sufficient time to seek prior judicial authorization, ex parte or otherwise, for the child's removal, then the circumstances are not emergent.'" Id. (quoting Tenenbaum, 193 F.3d at 594).

45

To show that emergency circumstances existed, "[t]he government must offer 'objectively reasonable' evidence that harm [was] imminent." Id. Although this Court has not attempted to set forth exhaustively the types of factual circumstances that constitute imminent danger justifying emergency removal as a matter of federal constitutional law, we have concluded that these circumstances include "the peril of sexual abuse," id., the "risk that children will be 'left bereft of care and supervision,'" id. (quoting Hurlman v. Rice, 927 F.2d 74, 80 (2d Cir. 1991)), and "immediate threat[s] to the safety of the child," Hurlman, 927 F.2d at 80 (internal quotation marks omitted); see also N.Y. Fam. Ct. Act § 1024(a) (defining emergency circumstances, for the purposes of state law, as "circumstance[s]" wherein a child's remaining in the parent's care and custody "presents an imminent danger to the child's life or health").

B. Analysis

The district court correctly concluded that summary judgment was not appropriate on the underlying merits of the plaintiffs' procedural due process claims because Woo did not demonstrate, as a matter of law, that he did not have time to obtain a court order authorizing the removal of the Southerland Children before taking that act. See Southerland II, 521 F. Supp. 2d at 235 n.31 (citing Nicholson, 344 F.3d at 171). The

46

court nonetheless granted summary judgment on qualified immunity grounds, concluding that "the law concerning procedural due process rights in the context of child removals was not clearly defined at the time of the events in question." Id. at 232.

However, the district court overstated the extent to which the relevant standards were undeveloped at the time of the removal. In Hurlman, some six years before the events here in issue, we recognized that

> officials may remove a child from the custody of the parent without consent or a prior court order only in "emergency" circumstances. Emergency circumstances mean circumstances in which the child is immediately threatened with harm, for example, where there exists an immediate threat to the safety of the child, or where the child is left bereft of care and supervision, or where there is evidence of serious ongoing abuse and the officials have reason to fear imminent recurrence.

Hurlman, 927 F.2d at 80 (citations and internal quotation marks omitted); see also Robison, 821 F.2d at 921-22 (describing the "'emergency' circumstances" exception and collecting cases).[20]

It thus was clearly established at the time of the Southerland

---

[20] We disagree with the defendants' assertion that Hurlman and Robison are not controlling here because the state officers in those cases were unlawfully on the premises, whereas Woo had a court order (albeit a disputed one) to enter the Southerland home. Woo's removal of the Southerland Children was without prior judicial authorization. Although Woo did have a court order to enter the home, he did not have an order to remove the Southerland Children from it. See Southerland II, 521 F. Supp. 2d at 224, 226, 235 n.31.

47

Children's removal that state officials could not remove a child from the custody of a parent without either consent or a prior court order unless "'emergency' circumstances" existed. Hurlman, 927 F.2d at 80; see also Cecere v. City of N.Y., 967 F.2d 826, 829-30 (2d Cir. 1992) (setting forth the "clearly established" procedural due process principles that apply in this context); Velez v. Reynolds, 325 F. Supp. 2d 293, 314-15 (S.D.N.Y. 2004) (explaining those principles).

In concluding that the law of procedural due process was not clearly established in the child-removal context by 1997, the district court in this case relied primarily on our decision in Tenenbaum. There, two years after the events here in issue, we held as a matter of first impression that "where there is reasonable time consistent with the safety of the child to obtain a judicial order, the 'emergency' removal of a child is unwarranted." Tenenbaum, 193 F.3d at 596. Because this principle was not clearly established in 1990 -- the year the underlying conduct at issue in Tenenbaum took place -- we affirmed the district court's decision in that case that the defendants were entitled to qualified immunity. We also made clear, however, that even in 1990, "it was established as a general matter . . . that 'except where emergency circumstances exist' a parent can 'not be deprived' of the custody of his or her child 'without due process, generally in the form of a

48

predeprivation hearing.'" Id. at 596 (quoting Hurlman, 927 F.2d at 79).

In the present case, however, the plaintiffs assert "not solely that defendants had sufficient time to obtain a court order, but that the circumstances in which Woo found the children did not warrant their removal at all, whether evaluated by pre- or post-Tenenbaum standards." Southerland Children's Br. at 39.[21] We understand the plaintiffs' contention to be that "emergency circumstances" warranting removal simply did not exist because the conditions in the Southerland home were insufficiently dangerous.

The district court did not decide as a matter of law that emergency circumstances existed in the Southerland home. To

---

[21] In Tenenbaum, a removal was carried out because the child had reported -- albeit under questionable circumstances -- that her father had sexually abused her. See Tenenbaum, 193 F.3d at 590, 594. There was no doubt at the time that the possibility of sexual abuse was, as it always is, a serious concern. At issue was whether there was nonetheless time under the circumstances to secure a court order prior to effecting the removal without risking imminent danger to the child. See id. at 608 (Jacobs, J., concurring in part and dissenting in part) (describing majority opinion as holding that, while there was "exigency," there was still no "emergency," because there was time to obtain a court order). Tenenbaum represented a novel application of procedural due process law because of the majority's holding that, regardless of the seriousness of the allegations, it was still necessary to obtain a court order if time permitted. Here, by contrast, we understand the plaintiffs to assert that the circumstances presented did not necessitate an inquiry into whether there was time to obtain a court order, because the conditions in the Southerland home were not grave enough to trigger that inquiry.

the contrary, the district court concluded that "[v]iewing the facts in the light most favorable to plaintiffs, a reasonable juror could determine that the circumstances Woo encountered did not demonstrate an imminent danger to the children's life or limb." Southerland II, 521 F. Supp. 2d at 234 n.29. The court further decided that "a reasonable juror could find that there was sufficient time to acquire a court order prior to the removal." Id. at 235 n.31. In light of those determinations, with which we agree, and our assessment that the relevant law was clearly established by 1997, we cannot conclude as a matter of law that "it was objectively reasonable for [Woo] to believe [that his] acts did not violate those [clearly established] rights." Holcomb, 337 F.3d at 220. Qualified immunity therefore is not available to Woo on the plaintiffs' procedural due process claims at the summary judgment stage. Because summary judgment also cannot be granted to the defendants on the underlying merits of these claims,[22] we vacate the grant of summary judgment to Woo

---

[22] The district court correctly noted that there are material factual disputes concerning whether emergency circumstances existed warranting the immediate removal of the Southerland Children from their home. See Southerland II, 521 F. Supp. 2d at 234 n.29 & 235 n.31. But even where emergency circumstances warranting removal exist, "'the constitutional requirements of notice and opportunity to be heard are not eliminated but merely postponed.'" Kia P., 235 F.3d at 760 (quoting Duchesne, 566 F.2d at 826). Therefore, a plaintiff may have a viable claim for violation of procedural due process even where emergency circumstances existed at the time of removal, if the plaintiff does not receive a timely and adequate post-deprivation hearing. See id. at 760-61. In this case, as will

50

as to the procedural due process claims.

VI.   Southerland's Substantive Due Process Claim

Southerland asserts a substantive due process claim against Woo under the Fourteenth Amendment.  The district court held not only that qualified immunity attached to Woo's actions, but also that summary judgment would be warranted on the merits even in the absence of qualified immunity.  We agree that Woo is entitled to summary judgment on the merits, and we therefore affirm this portion of the district court's judgment.

A.   Substantive Due Process in the Child-Removal Context

Substantive due process rights safeguard persons "against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.'"  Tenenbaum, 193 F.3d at 600 (quoting County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)).  "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  Okin, 577 F.3d at 431 (quoting Lewis, 523 U.S. at 847 n.8).  The interference with the plaintiff's protected right must be "'so shocking, arbitrary, and egregious

be explained below, important factual questions remain concerning the post-removal judicial confirmation proceedings, if any, that took place in the days after the Southerland Children's removal from their home.

51

that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'"  Anthony, 339 F.3d at 143 (quoting Tenenbaum, 193 F.3d at 600); see also Lewis, 523 U.S. at 840 (doctrine of substantive due process "bar[s] certain government actions regardless of the fairness of the procedures used to implement them" (internal quotation marks omitted)). Thus, in the child-removal context, we ask whether "the removal . . . would have been prohibited by the Constitution even had the [plaintiffs] been given all the procedural protections to which they were entitled."  Tenenbaum, 193 F.3d at 600 (emphasis omitted).

We have long recognized that parents have a "constitutionally protected liberty interest in the care, custody and management of their children," id. at 593, and that the deprivation of this interest is actionable on a substantive due process theory, see id. at 600 (recognizing a "substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state'" (quoting Duchesne, 566 F.2d at 825)).  We have also observed, however, that "[a]lthough parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents

52

themselves." Wilkinson ex rel. Wilkinson v. Russell, 182 F.3d 89, 104 (2d Cir. 1999) (internal quotation marks omitted), cert. denied, 528 U.S. 1155 (2000).

We have explained that, in part because the law contemplates a careful balancing of interests, a parent's substantive constitutional rights are not infringed if a caseworker, in effecting a removal of a child from the parent's home, has a reasonable basis for thinking that a child is abused or neglected. See id.; Gottlieb, 84 F.3d at 518. "This Circuit has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a 'reasonable basis' for their findings of abuse." Wilkinson, 182 F.3d at 104; see also id. at 108 (concluding that the "reasonable basis test" requires that caseworkers' decisions to substantiate an allegation of child abuse "be consistent with some significant portion of the evidence before them"). We have applied this "reasonable basis" standard from time to time in recent years. See, e.g., Nicholson, 344 F.3d at 174; Phifer v. City of N.Y., 289 F.3d 49, 60 (2d Cir. 2002); Kia P., 235 F.3d at 758-59.

We have also recognized that state interference with a plaintiff's liberty interest must be severe before it rises to the level of a substantive constitutional violation. See, e.g.,

53

Anthony, 339 F.3d at 143.  "The temporary separation of [a child] from her parents" does not constitute an "interference [that is] severe enough to constitute a violation of [the parents'] substantive due-process rights," Tenenbaum, 193 F.3d at 601; see also, e.g., Kia P., 235 F.3d at 759; Cecere, 967 F.2d at 830 (ruling that plaintiff's generalized due-process claim failed because a "brief" four-day removal, executed "in the face of a reasonably perceived emergency," did not violate due process); Joyner ex rel. Lowry v. Dumpson, 712 F.2d 770, 779 (2d Cir. 1983) (concluding that there was no substantive due process violation where temporary transfer of custody to foster-care system did not "result in parents' wholesale relinquishment of their right to rear their children").  In Tenenbaum, we observed that in other contexts, our court and the Supreme Court had held that even very brief seizures or detentions could violate the Fourth Amendment rights of criminal suspects. See Tenenbaum, 193 F.3d at 601 (citing Davis v. Mississippi, 394 U.S. 721 (1969), which held that police detention, even for a brief period of time, violated the Fourth Amendment where there was no probable cause to arrest, and United States v. Langer, 958 F.2d 522, 524 (2d Cir. 1992), which held that police detention even for ten to fifteen minutes was "constitutionally significant" for purposes of 18 U.S.C. § 242).  We reasoned, however, that "[i]t does not follow from the principle that brief seizures of people may be unreasonable and

54

therefore violate the Fourth Amendment that brief removals of children from their parents to protect them from abuse are without any reasonable justification in the service of a legitimate governmental objective under the Due Process Clause." Tenenbaum, 193 F.3d at 601 (internal quotation marks and citation omitted).

Thus, "brief removals [of a child from a parent's home] generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." Nicholson, 344 F.3d at 172 (citing Tenenbaum, 193 F.3d at 600-01 & n.12). And once such "court confirmation of the basis for removal" is obtained, id., any liability for the continuation of the allegedly wrongful separation of parent and child can no longer be attributed to the officer who removed the child. Cf., e.g., E.D. ex rel. V.D. v. Tuffarelli, 692 F. Supp. 2d 347, 354, 368 (S.D.N.Y. 2010) (applying brief-removal doctrine, and granting summary judgment in favor of defendants, where family court confirmed the basis for ACS's temporary removal of children three days after removal occurred), aff'd, 408 F. App'x 448 (2d Cir. 2011).

B. Analysis

The district court, in deciding that Woo enjoyed qualified-immunity protection as to these charges, observed that

55

the Southerland Children "were removed in the context of a child protective investigation [in which] removal would be subject to court confirmation," Southerland II, 521 F. Supp. 2d at 232, and that "a timely post-deprivation hearing [was held] where a family court judge confirmed the removal," id. at 234. The court therefore concluded that it was objectively reasonable for Woo to think that Southerland's rights were not being violated because "[b]rief removals of children from their parents generally do not rise to the level of a substantive due process violation." Id. at 232 (brackets and internal quotation marks omitted).

We agree with the district court that the removal of children from their parent for the purpose of keeping the children safe does not violate the parent's substantive due process rights if a post-removal judicial proceeding is promptly held to confirm that there exists a reasonable basis for the removal. The period of time in which the child and parent are separated solely at the instance of the defendant is, in such a case, not sufficient to amount to a substantive due process violation by the defendant caseworker. See Nicholson, 344 F.3d at 172; Kia P., 235 F.3d at 759; Tenenbaum, 193 F.3d at 600-01. This is not a matter of the defendant's qualified immunity: Where the "brief-removal doctrine" applies, a plaintiff does not have a cause of action for a substantive due process violation in the first place. See, e.g., Kia P., 235 F.3d at 759 (applying

56

brief-removal doctrine and concluding that plaintiff's "rights to substantive due process were not abridged").

The viability of such a substantive due process cause of action on the facts of this case is not an easy judgment to make because the record is not entirely clear as to whether such a post-removal judicial proceeding occurred, and if so, the nature of it. In a previous opinion, the district court explained that the Southerland Children "remained in custody without a court order until the morning of June 12, 1997, at which time Woo obtained a court order confirming the removal." Southerland v. City of N.Y., No. 99-cv-3329, 2006 WL 2224432, at *1, 2006 U.S. Dist. LEXIS 53582, at *4 (E.D.N.Y. Aug. 2, 2006) (emphasis added). But Woo declared that "[t]he Family Court affirmed the removal of the Southerland/Felix children . . . on June 13, 1997," Woo Decl. ¶ 24, and Balan stated that "[t]he removal was affirmed by Family Court on June 14, 1997," Balan Decl. ¶ 18. It is also unclear whether Southerland was present at that hearing, whenever it was, or on what factual basis the Family Court decided that the continued removal of the Southerland Children was warranted.[23]

---

[23] These problems persist despite our prior instruction that Southerland "be given an opportunity to prove . . . that the subsequent family court proceedings were insufficiently prompt to pass constitutional muster." Southerland I, 4 F. App'x at 36.

We nonetheless conclude that summary judgment was warranted. Southerland and the Southerland Children dispute neither that a post-removal judicial confirmation proceeding was held nor that it took place within four days after removal. See Southerland Children's Br. at 23; Pro Se Pl.'s Opp'n to Defs.' Mot. for Summ. J. ¶¶ 36-37, Pro Se Submission of Sonny B. Southerland at 7 (Dkt. No. 192), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Mar. 14, 2007). Therefore, based on this concession, only the (at most) four days of removal prior to the court hearing are attributable to Woo. Tuffarelli, 692 F. Supp. 2d at 354, 368. In light of this concession, the question becomes: Was the four-day period a "shocking, arbitrary, and egregious" amount of time for Southerland to have been separated from his children at Woo's instruction, i.e., without an intervening judicial confirmation of the basis for removal. Anthony, 339 F.3d at 143 (internal quotation marks omitted).

We conclude, on the basis of previous consideration of similar circumstances by courts in this Circuit and our own judgment, that the four-day separation under these circumstances was not so long as to constitute a denial of substantive due process to Southerland. See Kia P., 235 F.3d at 759 ("day or two" removal to review a child's case did not violate substantive due process); Tuffarelli, 692 F. Supp. 2d at 368 (no substantive due process violation where children were removed on a Friday

58

evening, and judicial proceedings commenced in a timely manner on the following Monday); Green ex rel. T.C. v. Mattingly, 07-cv-1790(ENV)(CLP), 2010 WL 3824119, at *10, 2010 U.S. Dist. LEXIS 99864, at *34-35 (E.D.N.Y. Sept. 23, 2010) (four-day removal of child during ACS investigation did not violate substantive due process).

Although the Southerland Children continued to be separated from Southerland even after the post-removal confirmation proceeding, in light of the presumption of regularity that we attribute to state judicial proceedings, see, e.g., Honeycutt v. Ward, 612 F.2d 36, 41 (2d Cir. 1979), and in light of Southerland's failure to proffer any evidence tending to rebut that presumption, we cannot conclude that the continued separation of Southerland from his children following the judicial confirmation proceeding is fairly attributable to Woo. We therefore conclude that Southerland's substantive due process claim fails on its merits.[24] Accordingly, we affirm the grant of summary judgment to Woo on that basis as to this claim.

---

[24] As noted above, supra at 16 & n.9, because we affirm on that basis, we need not consider whether Southerland's substantive due process claim would be defeated on the alternate ground that Ciara and the Southerland Children were adjudged to be abused and neglected by the Family Court in July 1998.

59

## VII. The Southerland Children's Fourth Amendment Unlawful-Seizure Claim

Finally, the Southerland Children assert a claim for violation of their Fourth Amendment right to be free from unreasonable seizure.

A. Evolution of the Southerland Children's Theory of Liability

The Southerland Children originally characterized this constitutional claim as arising under the Due Process Clause of the Fourteenth Amendment. Specifically, they alleged that "Woo lacked a reasonable basis for removing the [Southerland] Children from plaintiff's home without a court order," and that "[i]n so doing, Woo deprived the [Southerland] Children of their substantive due process liberty interests in being in the care and custody of their father and natural guardian, guaranteed to them by the [F]ourteenth [A]mendment." Am. Compl. ¶ 51. They relied upon the Fourteenth Amendment notwithstanding our observation in Southerland I that "[t]he children's claims for unreasonable seizure would proceed under the Fourth Amendment [as applied to the states by the Fourteenth] rather than the substantive component of the Due Process Clause." Southerland I, 4 F. App'x at 37 n.2 (citing Kia P., 235 F.3d at 757-58).

By the time of the summary judgment proceedings after remand, the Southerland Children appeared to recognize that their claim did indeed arise under the Fourth Amendment. See Southerland Children's Mem. of Law in Opp'n to Mot. for Summ. J.

60

at 16-20 ("Children's Dist. Ct. Br.") (Dkt. No. 184), Southerland v. City of N.Y., No. 99-cv-3329 (E.D.N.Y. Dec. 29, 2006) (arguing the Southerland Children's substantive due process claim as though it arose under the Fourth Amendment). And in its opinion resolving the summary judgment motion, the district court correctly noted that the Southerland Children's substantive due process constitutional claim was governed by the Fourth Amendment. See Southerland II, 521 F. Supp. 2d at 230 n.24 (citing Southerland I, 4 F. App'x at 37 n.2).

The Southerland Children also narrowed their theory of liability as to the legal substance of that claim. Originally, they pled that the removal was unconstitutional both because it lacked a "reasonable basis," Am. Compl. ¶ 51, and because the removal had the effect of separating them from Southerland, thereby depriving them of their "liberty interests in being in the care and custody of their father," id. In effect, the Southerland Children thus pled both that their warrantless seizure was unreasonable because it was not supported by an exception to the Fourth Amendment warrant requirement (no "reasonable basis"), and that the seizure was unreasonable insofar as it burdened the Southerland Children's substantive due process right to "be[] in the care and custody of their

61

father."[25]

In their submission opposing the defendants' summary judgment motion, however, the Southerland Children appeared to have abandoned the theory that the seizure unreasonably burdened their due process right to their father's care and custody. In other words, they no longer challenged the reasonableness of the

[25] A Fourth Amendment unlawful-seizure claim differs from a Fourth Amendment unlawful-search claim. It is not yet clear from the case law of our Circuit what kinds of Fourth Amendment unlawful-seizure claims might be asserted by a child who is removed from his or her home. From reviewing our past decisions and those of other circuits, however, we can identify at least three possibilities.

First, a child might assert that the act of seizure itself lacked a lawful basis, such as consent, probable cause, or exigent circumstances. See, e.g., Southerland II, 521 F. Supp. 2d at 234 n.29 (evaluating Southerland Children's Fourth Amendment unlawful-seizure claim in those terms).

Second, a child might assert that the seizure was carried out in an unreasonable manner, such as through the use of excessive force or through a sudden, surprise raid. See, e.g., Brokaw v. Mercer County, 235 F.3d 1000, 1011-12 (7th Cir. 2000) (upholding manner-of-seizure claim brought by child removed from his home where officers "acted like kidnappers").

Third, a child might assert that the seizure endured for an unreasonable length, and thereby burdened the child's interest in being in the care and custody of his or her parents. See, e.g., Hernandez ex rel. Hernandez v. Foster, 657 F.3d 463, 474 (7th Cir. 2011) (recognizing and upholding seized child's claim for "continued withholding" under the Fourth Amendment); see also Albright v. Oliver, 510 U.S. 266, 276-81 (1994) (Ginsburg, J., concurring) (endorsing "continuing seizure" doctrine in the law-enforcement context); Fontana v. Haskin, 262 F.3d 871, 878-80 & nn.4-5 (9th Cir. 2001) (discussing "continuing seizure" doctrine and collecting cases).

effect or duration of their removal as a violation of their rights to substantive due process.  Instead, they argued only that the removal was unconstitutional as an unlawful seizure because the act of removal itself was unsupported by sufficient legal justification:  Woo could not demonstrate the existence of either parental consent or exigent circumstances that would justify the act of removal absent prior judicial authorization.  See generally Children's Dist. Ct. Br. at 16-20.

B.    District Court's Analysis

The district court properly analyzed this claim solely by reference to the theory set forth in the Southerland Children's summary-judgment briefing -- i.e., that their Fourth Amendment rights had been violated because there were no "exigent circumstances" justifying their removal without a court order.  See Southerland II, 521 F. Supp. 2d at 234 n.29.  In light of the Southerland Children's abandonment of any of the other alleged theories of liability, especially under principles of substantive due process, the district court correctly framed the claim in this manner.

As with the procedural due process claim, see supra Part V.A., the court concluded that at the time of the alleged seizure, "there was no clear application of Fourth Amendment standards in the child removal context."  Southerland II, 521 F. Supp. 2d at 231.  The court pointed, in particular, to Tenenbaum,

63

193 F.3d at 605, our decision that viewed Fourteenth Amendment due process claims as properly Fourth Amendment unlawful-seizure claims of the sort asserted here, but that had not issued until after the seizure in this case. See Southerland II, 521 F. Supp. 2d at 231. Based on the absence of clear law at the time of the Southerland Children's removal, the court held, as a matter of law, that Woo was protected from this claim by qualified immunity. Id. at 231.

In addition to the immunity question, and despite finding in Woo's favor on it, the district court nonetheless addressed the merits of the Southerland Children's Fourth Amendment unlawful-seizure claim. It concluded in a footnote that, "[i]n the absence of Woo's qualified immunity defense," summary judgment would not be warranted on this claim on its underlying merits because "a reasonable juror could determine that the circumstances Woo encountered did not demonstrate an imminent danger to the children's life or limb."[26] Id. at 234 n.29.

---

[26] In employing this "imminent danger" standard, the district court appears to have relied on section 1024(a) of the New York Family Court Act. See Southerland II, 521 F. Supp. 2d at 234 n.29. That statute provides that a child-protective worker may effect an ex parte removal of a child only where the worker has "reasonable cause to believe that the child is in such circumstance or condition that his or her continuing in . . . the care and custody of the parent . . . presents an imminent danger to the child's life or health" and where "there is not time enough to apply for a[] [court] order." N.Y. Fam. Ct. Act § 1024(a). Our assessment of the lawfulness of the removal of the Southerland Children from their home, however, is controlled by federal, not state, standards. See, e.g., United States v. Chirino, 483 F.3d 141, 149 (2d Cir. 2007).

64

## C. Appeal

On appeal, the Southerland Children appear to persist in their view that their Fourth Amendment unlawful-seizure claim is addressed solely to the issue of whether there was a legal basis for the act of removal. See Southerland Children's Br. at 24, 36-41; Woo Br. at 36-37; Southerland Children's Reply Br. at 6-8. We review the argument in those terms, treating as abandoned any argument the Southerland Children might have made that the removal was unreasonable because it had an unlawful effect or was of unlawful duration, and was therefore a violation of their substantive due process rights. See City of N.Y. v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011).

### 1. Standard for Evaluating Unlawful-Seizure Claims in the Child-Removal Context

By way of footnote, the district court decided that Woo was entitled to summary judgment with respect to the claim that the removal was unlawful. In doing so, the court assumed that a seizure of a child without a court order is constitutionally justified under the Fourth Amendment only if there are "exigent circumstances." See Southerland II, 521 F. Supp. 2d at 234 n.29. This Court, however, has yet to articulate definitively the legal standard that applies to a Fourth Amendment unlawful-seizure claim brought by a child alleging that his or her removal without parental consent or prior judicial authorization was not supported by sufficient cause.

65

In Tenenbaum, we considered this question, apparently for the first time. See 193 F.3d at 603-05. We described, in dicta, three possible "modes of determining whether a seizure was 'reasonable' under the Fourth Amendment . . . in cases where the state seizes a child in order to prevent abuse or neglect." Kia P., 235 F.3d at 762 (citing and discussing Tenenbaum, 193 F.3d at 603-05).

As one mode, we referred to the "exigent circumstances" exception to the warrant requirement that is well-established in the law-enforcement context. See Tenenbaum, 193 F.3d at 604 (noting that "it is core Fourth Amendment doctrine that a seizure without consent or a warrant is a 'reasonable' seizure if it is justified by 'exigent circumstances'"); see generally United States v. Klump, 536 F.3d 113, 117-19 (2d Cir. 2008) (describing and applying the "exigent circumstances" exception in law-enforcement context), cert. denied, 129 S. Ct. 664 (2008); United States v. MacDonald, 916 F.2d 766, 769-70 (2d Cir. 1990) (en banc) (elaborating standards). We concluded that such an exception would be viable in the child-removal context too. Tenenbaum, 193 F.3d at 604-05. We suggested that that exception would apply when "a child is subject to the danger of abuse if not removed . . . before court authorization can reasonably be obtained." Id. at 605.

As another mode, we said that a seizure conducted in accordance with the ordinary probable-cause standard -- the standard that applies in the law-enforcement context -- might also suffice.  Under such a rule, a caseworker could lawfully remove a child from his or her home without parental consent or prior judicial authorization if the caseworker knew "facts and circumstances that were sufficient to warrant a person of reasonable caution in the belief that" a child was abused or neglected.  Id. at 602-03 (internal quotation marks omitted).

Alternatively, we noted that under some circumstances an even lesser, "special needs," standard might apply, in which case only "reasonable cause" would be necessary to render lawful a warrantless seizure.  See id. at 603-04.  That would reflect the principle that "there are some agencies outside the realm of criminal law enforcement where government officials have 'special needs beyond the normal need for law enforcement [that] make the warrant and probable-cause requirement impracticable.'"  Id. at 603 (quoting O'Connor v. Ortega, 480 U.S. 709, 720 (1987) (plurality opinion)) (alterations in Tenenbaum).  We observed, however, that case law in our sister circuits suggested that the "emergency removal of a child by caseworkers is not such a 'special needs' situation."  Id. at 603-04 (collecting cases).

We did not decide in Tenenbaum which of those three standards should apply as the constitutional floor in

67

child-removal cases -- i.e., the standard below which an officer could not go without violating the Fourth Amendment.  Id. at 605; see also Kia P., 235 F.3d at 762-63 (reserving same question). But we did conclude that, at least "where information possessed by a state officer would warrant a person of reasonable caution in the belief that a child is subject to the danger of abuse if not removed from school before court authorization can reasonably be obtained, the 'exigent circumstances' doctrine . . . permits removal of the child without a warrant equivalent and without parental consent."  Tenenbaum, 193 F.3d at 605 (citing Hurlman, 927 F.2d at 80); see also Phifer, 289 F.3d at 60-61 (recognizing and applying this holding in the context of a Rooker-Feldman analysis).  And, subsequent to Tenenbaum, we have assumed that the standard to be applied to such claims cannot be any less than probable cause.  See Nicholson, 344 F.3d at 173 ("We have not addressed . . . the question whether[,] in the context of the seizure of a child by a state protective agency[,] the Fourth Amendment might impose any additional restrictions above and beyond those that apply to ordinary arrests." (emphasis added)).

Again here, we need not adopt a standard.  We observe first, as we did in Tenenbaum, that this case does not present circumstances in which the "special needs" test applies, if ever it does in the child-removal context.  Tenenbaum, 193 F.3d at

68

603.[27]  In this case "the requirement of obtaining the equivalent of a warrant where practicable [would not] impose[] intolerable burdens on the government officer or the courts, [and] would [not] prevent such an officer from taking necessary action, or tend to render such action ineffective," Tenenbaum, 193 F.3d at 604.

The elimination of a possible "special needs" approach leaves either the probable-cause or exigent-circumstances standard applicable to the merits of whether Woo's behavior violated the Children's constitutional rights.[28]  But we need not decide between them -- at least not yet.  As explained below, regardless of which standard applies, Woo cannot establish as a matter of law on the current record that he would be entitled to qualified immunity or that no reasonable jury could find in favor of the Children on the merits of their Fourth Amendment seizure claim.

---

[27] Case law from our sister circuits, subsequent to Tenenbaum, concludes that the "special needs" test is never applicable in this context. See, e.g., Siliven v. Ind. Dep't of Child Servs., 635 F.3d 921, 926-28 (7th Cir. 2011); Riehm v. Engelking, 538 F.3d 952, 965 (8th Cir. 2008); Gates v. Texas Dep't of Protective & Regulatory Servs., 537 F.3d 404, 427-29 (5th Cir. 2008).

[28] Our sister circuits apply somewhat divergent standards in determining whether a seizure of a child without judicial authorization or parental consent violates the Fourth Amendment. See, e.g., See Siliven, 635 F.3d at 926-28 (probable cause or exigent circumstances sufficient); Riehm, 538 F.3d at 965 (same); Gates, 537 F.3d at 427-29 (exigent circumstances required); Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000) (same).

## 2.   Qualified Immunity

The district court decided that Woo was entitled to qualified immunity because "prior to the Court of Appeals' decision in Tenenbaum [in 1999], there was no clear application of Fourth Amendment standards in the child removal context." Southerland II, 521 F. Supp. 2d at 231.  Although we agree with the district court's observation that this Circuit had not yet applied Fourth Amendment unlawful-seizure principles in the child-removal context by 1997, we think that the district court erred by conducting its inquiry solely by reference to the label -- "unlawful seizure" -- attached to the claim at issue.

Our decision in Tenenbaum did indeed effect a change in the constitutional nomenclature governing a child's claim for alleged substantive constitutional violations arising out of his or her removal from a parental home.  There, the plaintiffs contended that "[their daughter's] temporary removal [from school] for the purpose of subjecting her to a medical examination violated their and [their daughter's] substantive due-process rights."  Tenenbaum, 193 F.3d at 599.  We noted that the Supreme Court observed in Albright v. Oliver, 510 U.S. at 273, that

> where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

70

Tenenbaum, 193 F.3d at 599 (brackets and internal quotation marks omitted).  We said that "'[s]ubstantive due process analysis is . . . inappropriate . . . if [the] claim is covered by the Fourth Amendment.'"  Id. at 600 (quoting Lewis, 523 U.S. at 843) (second brackets in original; other internal quotation marks omitted).  We then concluded that the daughter's "removal and her examination constituted a seizure and search, respectively, under the Fourth Amendment," id., and that her claim "therefore 'must be analyzed under the standard appropriate to [the Fourth Amendment], not under the rubric of substantive due process.'"  Id. (quoting United States v. Lanier, 520 U.S. 259, 272 n.7 (1997)).[29]

The fact that Tenenbaum changed the legal "rubric" applicable to the Southerland Children's constitutional claim -- from substantive due process to illegal seizure -- however, is not alone determinative of whether the constitutional rights implicated in the Children's seizure were clearly established prior to the time of the seizure.  It would be inappropriate, we think, to afford Woo qualified immunity on the Southerland Children's claim solely because, two years after the events in

---

[29] We have since reaffirmed that "the Fourth Amendment applies in the context of the seizure of a child by a government-agency official during a civil child-abuse or maltreatment investigation."  Kia P., 235 F.3d at 762.  We relied on Kia P. in turn in Southerland I in advising that "[t]he [Southerland] children's claims for unreasonable seizure would proceed under the Fourth Amendment rather than the substantive component of the Due Process Clause."  Southerland I, 4 F. App'x at 37 n.2.

71

question, we shifted the constitutional label for evaluating that claim from the Fourteenth to the Fourth Amendment. But cf. Tenenbaum, 193 F.3d at 605 (resting grant of qualified immunity on basis that there "was no 'clearly established' law under the Fourth Amendment" in 1990 concerning standards for removing a child from her school). What matters is whether an objectively reasonable caseworker in Woo's position would have known that removing a child from his or her home without parental consent, circumstances warranting the removal, or court order would violate a constitutional right -- not whether the caseworker would have known which constitutional provisions would be violated if the caseworker proceeded to act in a particular way.

We reached a similar conclusion in Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir.), cert. denied, 552 U.S. 818 (2007). There we made clear that the constitutional "right to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence," id. at 211, was a species of the right to be free from unlawful seizure under the Fourth Amendment, not a substantive due process right under the Fourteenth Amendment, see id. at 208-09. In then proceeding to undertake a qualified-immunity inquiry, we cautioned that our "clarification [of the law was] of no consequence to the question of whether the right was clearly established [at the time of the relevant events], because the proper inquiry is whether the right itself -- rather than its

72

source -- is clearly established."  Id. at 212 (collecting cases; emphases in original).

Here, as in Russo, in inquiring whether there was clearly established law to govern the Southerland Children's claim in 1997, we look not only to authorities interpreting the Fourth Amendment, but to all decisions concerning the same substantive right -- the right of a child not to be seized from his or her home without parental consent, prior judicial authorization, or the existence of special circumstances.

Although the standard for determining whether the circumstances justify seizure of a child without judicial authorization or parental consent under the Fourth Amendment was not established by 1997 and, as we have pointed out, remains unsettled to this day, the Children's right not to be taken from the care of their parent without court order, parental consent, or emergency circumstances was firmly established, albeit under a procedural due process framework.  See Hurlman, 927 F.2d at 80. Regardless of whether probable cause or exigent circumstances must be established to justify a warrantless seizure for Fourth Amendment purposes, the existence of emergency circumstances sufficient to justify removal of the Southerland Children in a manner comporting with their due process rights would also certainly suffice to justify their removal in a manner comporting with their Fourth Amendment rights barring unreasonable

seizure.[30]  To that extent, at the time of the events in this case, the Southerland Children's Fourth Amendment rights against unreasonable seizure were clearly established.

In light of this determination, the next question the Court must address is whether "it was objectively reasonable for [Woo] to believe [that his] acts did not violate th[e Childrens' clearly established] right[]," Holcomb, 337 F.3d at 220, not to be taken from the care of their parent without court order, parental consent, or emergency circumstances.  Once again, for the purposes of the qualified immunity analysis, the legal origin of the right is not determinative.  If Woo has established that he was objectively reasonable in believing that he did not violate the Children's right to be free from unwarranted seizure without exigent circumstances, court order, or parental consent, then he is protected against their Fourth Amendment seizure claim, no matter the standard used to determine liability on this claim on the merits.  For the same reasons as in our procedural due process analysis -- that we cannot conclude as a matter of law on the current record that it would have been objectively reasonable for Woo to believe that his actions did not violate the Children's constitutional right not to be removed from their home barring exigent circumstances - we cannot conclude as a matter of law that Woo must prevail on the "objectively

[30]  See supra, note 21 (discussing the distinction between an exigent circumstances and an emergency circumstances standard).

74

reasonable" inquiry as to the violation of the children's Fourth Amendment illegal seizure claims. See supra, Part V. Thus, qualified immunity is unavailable to Woo at this stage on the current record.

3. The Merits of the Fourth Amendment Unlawful Seizure Claim

Because we conclude here that Woo is not entitled to qualified immunity as a matter of law, at least on this record, the remaining question is whether Woo is entitled to summary judgment on the merits. The district court assumed that a seizure of a child without a court order or parental consent is constitutionally justified under the Fourth Amendment only if there are "exigent circumstances." See Southerland II, 521 F. Supp. 2d at 234 n.29. It concluded that, taking the evidence in the light most favorable to the Southerland Children, "a reasonable juror could determine that the circumstances Woo encountered did not demonstrate an imminent danger to the children's life or limb." Id.

As our discussion here makes clear, however, this may not be the standard that should apply in deciding the merits of the Children's Fourth Amendment seizure claim. The district court should reconsider the merits-question -- on an expanded record if the court deems that appropriate -- cognizant of the uncertainty in the legal landscape. The district court may need to decide, in the first instance, what standard should apply, but it may not. For example, if the court determines that under

either standard the Southerland children can establish that the circumstances in the home did not justify the seizure as a matter of law, then it need not decide whether the probable cause or exigent circumstances standard is applicable.

VIII.  Further Development of the Record

As should be clear by now, nothing in this opinion should be read to foreclose the district court from exercising its sound discretion as to the nature and scope of any further pretrial proceedings on remand.  Cf. Huminski v. Corsones, 386 F.3d 116, 152 (2d Cir. 2004) (district court free to consider whether granting additional discovery would be appropriate before deciding a renewed motion for summary judgment on remand).  The district court may, although it need not, permit additional discovery, a renewed motion for summary judgment, or both.  And it follows that, should this case proceed to trial, nothing in this opinion should be construed as preventing the district court from entertaining a properly supported motion for judgment as a matter of law by the defendants.[31]

---

[31] On remand, with respect to both the conduct and determination of any further pretrial proceedings and a subsequent trial, if any, nothing in this opinion is intended to limit the district court's discretion to consider or admit into evidence (1) the outcome of the Family Court proceedings addressing and disposing of the claims of child abuse involving Southerland, or (2) testimony, documents, or physical evidence from those proceedings to the extent the outcome of those proceedings or other such evidence may bear on, inter alia, background, witness credibility, scope or amount of damages, Woo's professional judgment, or such other issues, as the district court may determine.  We leave to the district court's

**CONCLUSION**

For the foregoing reasons, we affirm the grant of summary judgment as to Southerland's claim for infringement of his substantive due process rights under the Fourteenth Amendment. We vacate the district court's grant of summary judgment as to Southerland's and the Southerland Children's claims for Fourth Amendment violations arising out of the allegedly unlawful search of the Southerland home; as to Southerland's and the Southerland Children's claims for violations of procedural due process under the Fourteenth Amendment; and as to the Southerland Children's claim for unlawful seizure under the Fourth Amendment and remand to the district court for further proceedings.

Each party shall bear his, her or its own costs on appeal.

---

determination in the first instance the admissibility of any such evidence for any particular purpose.